Mauro M. Wolfe (MW-2380)
1633 Broadway
New York, New York 10019-6708
(212) 277-6726

Richard J. Leveridge
Elaine Metlin
Jodi Trulove
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200
(pro hac vice admission pending)

David C. Eddy
Marguerite Willis
Travis C. Wheeler
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC  29201
(803) 771-8900
(pending pro hac vice admission)

R. Bruce Holcomb
Christopher Leonardo
ADAMS HOLCOMB LLP
1875 Eye Street NW, Suite 810
Washington, DC  20006
(202) 580-8820
(pro hac vice admission pending)

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DASH MULTI-CORP, INC., MARCHEM CORPORATION, MARCHEM SOUTHEAST, INC., AND MARCHEM PACIFIC, INC., | ) Docket No.: <br> ) <br> ) CIVIL ACTION <br> ) |
| PLAINTIFFS, | ) **COMPLAINT AND** <br> ) **JURY DEMAND** |
| v. | ) <br> ) |
| BASF SE, BASF CORPORATION, THE DOW CHEMICAL COMPANY, AND HUNTSMAN INTERNATIONAL LLC, | ) <br> ) <br> ) <br> ) |
| DEFENDANTS. | ) <br> ) |

## COMPLAINT
## JURY TRIAL DEMANDED

Plaintiffs Dash Multi-Corp, Inc., MarChem Corporation, MarChem Southeast, Inc., and MarChem Pacific, Inc. (hereinafter collectively referred to as "Plaintiffs") bring this action against defendants BASF SE (f/k/a BASF AG) and BASF Corporation (collectively, the "BASF Defendants"), The Dow Chemical Company, and Huntsman International LLC (hereinafter collectively referred to as "Defendants") arising out of Defendants' and their co-conspirators' global conspiracy to fix, raise, maintain, and stabilize the prices of, and allocate customers and markets for, certain polyurethanes products specified below. Plaintiffs seek to recover treble damages and injunctive relief for violation of Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26. Plaintiffs demand a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, and allege the following:

### NATURE OF THE CASE

1.      Plaintiffs, as well as their predecessors-in-interest and assigns, are purchasers of polyether polyols, monomeric or polymeric diphenylmethane diisocyanates

2

("MDI"), toluene diisocyanates ("TDI"), MDI-TDI blends, and/or polyether polyols systems (except those that also contain polyester polyols) (hereinafter collectively referred to as "Polyether Polyol Products").

2.     This antitrust action arises out of a worldwide combination and conspiracy among Defendants and their co-conspirators to, *inter alia*, fix, raise, maintain, and stabilize the prices at which Polyether Polyol Products were sold, and to allocate customers and markets for Polyether Polyol Products, throughout the world, including in the United States and Europe, from at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs (hereinafter the "conspiracy period").  In furtherance of their unlawful worldwide combination and conspiracy, Defendants and their co-conspirators combined and conspired to fix the prices of Polyether Polyol Products through a series of agreed price increases and price agreements, and agreed to allocate customers and markets for Polyether Polyol Products.  Defendants and their co-conspirators attended numerous meetings together throughout the world, including in the United States, Europe, and Asia, and engaged in numerous communications to discuss, implement, and enforce their unlawful combination and conspiracy.  Because of the continuous unlawful conspiracy of Defendants and their co-conspirators throughout the world, including in the United States and within this District, Plaintiffs paid artificially inflated prices for Polyether Polyol Products that they purchased from Defendants and their co-conspirators in the United States from at least as early as 1994 through at least December 31, 2004, and possibly continuing thereafter (hereinafter the "damages period").

3

3.      In November 2004 and thereafter, a series of class actions were initiated against Defendants and their co-conspirators on behalf of a class of purchasers of Polyether Polyol Products in the United States. At all relevant times, Plaintiffs were members of the putative plaintiff class. Those actions were consolidated for pretrial purposes by the Judicial Panel on Multidistrict Litigation in the District of Kansas in *In re Urethane Antitrust Litigation*, MDL No. 1616 (D. Kan. 2004) (hereinafter the "Polyether Class Action"). The defendants currently named in the Polyether Class Action are BASF AG (now known as BASF SE), BASF Corporation, The Dow Chemical Company, Huntsman International LLC, and Lyondell Chemical Company.

4.      Originally, co-conspirators Bayer AG, Bayer Corporation, Bayer MaterialScience AG, and Bayer MaterialScience LLC also were defendants in the Polyether Class Action, but a settlement with these defendants was reached in that class action in early 2006. The Court certified a settlement class and authorized dissemination of a notice regarding the settlement. Pursuant to that notice, on or about June 9, 2006, Plaintiffs requested exclusion from the Bayer class settlement.

5.      On July 29, 2008, the District Court of Kansas granted class plaintiffs' motion for class certification in the Polyether Class Action and certified a class for Polyether Polyol Products purchases from certain Defendants in the United States during the period January 1, 1999 through December 31, 2004. On October 10, 2008, the District Court of Kansas authorized dissemination of the notice of the certified class action to all class members. Plaintiffs herein timely opted out of this litigation class.

4

## JURISDICTION AND VENUE

6.     This Complaint is filed and these proceedings are instituted on behalf of

Plaintiffs under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to obtain, *inter*

*alia*, injunctive relief and to recover treble damages and the costs of suit, including

reasonable attorneys' fees, against Defendants for the injuries sustained by these

Plaintiffs by reason of Defendants' and their co-conspirators' violations of Section 1 of the

Sherman Act (15 U.S.C. § 1).

7.     This Court has subject matter jurisdiction over Plaintiffs' Sherman Act claims

pursuant to 28 U.S.C. §§ 1331 and 1337, as well as under Sections 4 and 16 of the

Clayton Act (15 U.S.C. §§ 15(a), 26).

8.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton

Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391 because each Defendant resides,

maintains an office or agent, transacts business, or is found within this District, a

substantial part of the events giving rise to Plaintiffs' claims occurred in this District,

and/or a substantial portion of the affected interstate commerce was carried out in this

District.

9.     Personal jurisdiction exists over Defendants pursuant to Section 12 of the

Clayton Act (15 U.S.C. § 22) and the New Jersey Long-Arm Statute, N.J. Ct. R. 4:4-4

(2008), and each Defendant is within the jurisdiction of this Court for purposes of service

of process.

10.    The Defendants and their co-conspirators are major companies with sales

and operations throughout the United States and/or worldwide.  Between 1994 and 2004,

upon information and belief, Defendants and their co-conspirators sold over

5

$36 billion worth of Polyether Polyol Products throughout the United States. Upon information and belief, these sales consisted of more than $7 billion by BASF, $12 billion by Bayer, $10 billion by Dow, $6 billion by Huntsman, and more than $1 billion by Lyondell.

11.     Defendants and/or their co-conspirators engaged in the interstate and international commerce described in this Complaint, a substantial part of which was carried out within this District. Defendants and/or their co-conspirators performed substantial, unlawful acts in furtherance of their unlawful combination and conspiracy within this District, and throughout the United States and the world, that were expressly aimed at, directed toward, intended to affect, and did affect Plaintiffs and others located in the United States, including within this District. Defendants and their co-conspirators knew their unlawful combination and conspiracy would inflict injuries on purchasers of Polyether Polyol Products throughout the world, including those purchasing in the United States and including Plaintiffs and others purchasing Polyether Polyol Products in or from New Jersey. Defendants and their co-conspirators acted in furtherance of the conspiracy in New Jersey and throughout the United States, by, *inter alia*:  (i) selling Polyether Polyol Products in New Jersey at artificially inflated prices; (ii) eliminating competition for Polyether Polyol Products in New Jersey from non-conspirators;
(iii) limiting supply of Polyether Polyol Products sold in New Jersey and throughout the United States; (iv) providing false and pretextual reasons for price increases of Polyether Polyol Products in industry publications and to customers in New Jersey and throughout the United States; and (v) committing other practices in New Jersey that constitute *per se* violations of the Sherman Act.

6

12.     Defendants and their co-conspirators engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable anticompetitive effects upon interstate commerce within the United States and New Jersey, directly giving rise to Plaintiffs' claims.

## PLAINTIFFS

13.     Plaintiff Dash Multi-Corp., Inc. ("Dash Multi") is a Missouri corporation with its principal place of business at 2500 Adie Road, Maryland Heights, Missouri 63043. Dash Multi is the parent company of Plaintiffs MarChem Corporation, MarChem Southeast, Inc., and MarChem Pacific, Inc., and, through its subsidiaries, was a direct purchaser of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' and their co-conspirators' antitrust violations alleged herein.

14.     Plaintiff MarChem Corporation is a Missouri corporation with its principal place of business at 2500 Adie Road, Maryland Heights, Missouri 63043. MarChem Corporation was a direct purchaser of Polyether Polyol Products in the United States from one or more of the defendants or their co-conspirators during the damages period and was injured by Defendants' and their co-conspirators' antitrust violations alleged herein.

15.     Plaintiff MarChem Southeast, Inc. ("MarChem Southeast") is a Georgia corporation with its principal place of business at 400 N. Main Street, Adairsville, Georgia 30103. MarChem Southeast was a direct purchaser of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' and their co-conspirators' antitrust violations alleged herein.

7

16.     Plaintiff MarChem Pacific, Inc. ("MarChem Pacific") is a California corporation with its principal place of business at 212 W. Taft Avenue, Orange, California 92865.  MarChem Pacific was a direct purchaser of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' and their co-conspirators' antitrust violations alleged herein.

## DEFENDANTS AND CO-CONSPIRATORS

17.     Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Campus Drive, Florham Park, New Jersey 07932.  During the damages period, BASF Corporation manufactured and sold Polyether Polyol Products to purchasers in the United States, including to Plaintiffs in this action.  Upon information and belief, BASF Corporation participated directly in the combination and conspiracy alleged herein.

18.     Defendant BASF SE (f/k/a BASF AG) is a German corporation with its principal place of business at D-67056 Ludwigshafen, Germany.  BASF SE takes the central role as the largest operating company in the BASF Group and has extensive operations in the United States, Europe, and throughout the world.  During the damages period, BASF SE manufactured and sold Polyether Polyol Products, directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including, but not limited to, BASF Corporation and BASF Coordination Center Comm. V. (hereinafter collectively, the "BASF subsidiaries"), to purchasers in the United States and throughout the world, including to Plaintiffs in this action.  At all relevant times, BASF SE wholly owned and/or controlled the BASF subsidiaries, both generally and with respect to

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

the conduct of any of these subsidiaries and/or affiliates in furtherance of the unlawful acts alleged herein.  Upon information and belief, BASF SE participated in the combination and conspiracy alleged herein, both directly and through its control over the BASF subsidiaries.

19.     Defendant The Dow Chemical Company (hereinafter "Dow") is a Delaware corporation with its principal place of business at 2030 Dow Center, Midland, Michigan 48674.  During the damages period, Dow manufactured and sold Polyether Polyol Products, directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, to purchasers throughout the world, including in the United States and Europe, including to Plaintiffs in this action.  At all relevant times, Dow wholly owned and/or controlled its subsidiaries, both generally and with respect to the conduct of any of these subsidiaries and affiliates in furtherance of the unlawful acts alleged herein.  Upon information and belief, Dow participated in the combination and conspiracy alleged herein, both directly and through its control over its subsidiaries.

20.     Defendant Huntsman International LLC (f/k/a Huntsman ICI Chemicals LLC) (hereinafter "Huntsman") is a Delaware limited liability company with its principal place of business at 500 Huntsman Way, Salt Lake City, Utah 84108.  Huntsman was formed in 1999, in connection with the acquisition of the polyurethanes chemicals business of Imperial Chemicals Industries Ltd. ("ICI").  Prior to the sale of its polyurethanes business to Huntsman, ICI manufactured and sold Polyether Polyol Products to purchasers in the United States and Europe, including Plaintiffs in this action.  As part of that acquisition, Huntsman acquired ICI's liabilities.  Thereafter, during the damages period, Huntsman, its parents, subsidiaries, and affiliates, manufactured and sold Polyether Polyol Products to

9

purchasers throughout the world, including at least the United States and Europe, including to Plaintiffs in this action. Upon information and belief, Huntsman participated directly in the combination and conspiracy alleged herein.

21.    Co-conspirator BASF Coordination Center Comm. V. (hereinafter "BASF Coordination Center") is a Belgian corporation with its principal place of business at 600 Schelelaan, Antwerpen, Belgium. BASF Coordination Center is BASF's Global Polyurethanes Division. BASF Coordination Center is a subsidiary of BASF SE and is an affiliate of BASF Corporation. Upon information and belief, BASF Coordination Center developed a global strategy for BASF's polyurethanes business and participated directly in the worldwide combination and conspiracy alleged herein, which was directed at and specifically targeted the United States and Europe. BASF SE, BASF Corporation, and BASF Coordination Center are collectively referred to hereinafter as "BASF."

22.    Co-conspirators Bayer AG, Bayer Corporation, Bayer MaterialScience AG, and Bayer MaterialScience LLC (hereinafter collectively, "Bayer") are Defendants' co-conspirators with respect to the unlawful conduct and conspiracy alleged herein. Bayer AG and Bayer MaterialScience AG are German corporations. Bayer Corporation and Bayer MaterialScience LLC are United States companies with their principal places of business in Pennsylvania. At all relevant times, Bayer Corporation, Bayer MaterialScience LLC, and Bayer MaterialScience AG were wholly owned and/or controlled subsidiaries of Bayer AG. During the damages period, these Bayer entities manufactured and sold Polyether Polyol Products, directly or through their wholly-owned and/or controlled subsidiaries, affiliates, agents, and predecessors, to purchasers throughout the world, including at least in the United States and Europe, and including

10

Plaintiffs in this action. Upon information and belief, Bayer participated in the combination and conspiracy alleged herein both directly and through its control over the Bayer subsidiaries. Bayer's conduct and actions in furtherance of the conspiracy are attributable to its Defendant co-conspirators.

23.     Co-conspirator Lyondell Chemical Company (f/k/a Lyondell Petrochemical Company) (hereinafter "Lyondell") is Defendants' co-conspirator with respect to the unlawful conduct and the conspiracy alleged herein. Lyondell is a Delaware corporation with its principal place of business at One Houston Center, 1221 McKinney Street, Houston, Texas 77010. In or around 1998, Lyondell acquired Arco Chemical Company's polyurethanes business, and in 2000, Bayer acquired Lyondell's polyether polyols business. During the damages period, Lyondell manufactured and sold Polyether Polyol Products, directly or through its wholly-owned and/or controlled subsidiaries, affiliates, agents, and predecessors to purchasers throughout the United States, including Plaintiffs in this action.

24.     Various other individuals, companies, corporations, firms, partnerships, associations, agents, and other legal entities, the identities of which are presently unknown and/or that are not named as defendants in this action, may have participated as co-conspirators with Defendants in the violations alleged herein, and may have performed substantial acts and made statements in New Jersey and elsewhere throughout the United States and the world in furtherance thereof. All references to "Defendants" and "co-conspirators" include the named entities herein and their predecessors-in-interest, as well as these unknown individuals, companies, corporations, firms, partnerships, associations, agents, and other legal entities.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

25.     The acts charged in this Complaint as having been done by Defendants and their co-conspirators were authorized, ordered, ratified or done by or through Defendants' and their co-conspirators' officers, directors, agents, employees or representatives, while they were actively engaged in the management, direction, control or transaction of the businesses or affairs of Defendants and their co-conspirators.

## TRADE AND COMMERCE

26.     During the damages period, Defendants and their co-conspirators manufactured, distributed, sold, and shipped Polyether Polyol Products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than those states in which the Defendants and their co-conspirators produced these products. In addition, the primary raw materials used to manufacture Polyether Polyol Products were purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

27.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.  The conspiracy alleged herein in which Defendants and their co-conspirators participated was purposefully directed at the United States and had a direct, substantial, and reasonably foreseeable effect on the United States and on interstate commerce.

28.     Polyether polyols are intermediate chemical compounds based on propylene oxide or ethylene oxide that, among other things, are used in the manufacture of flexible foams and rigid foams.  While the large majority of polyether polyols are used to make flexible and rigid foams, polyether polyols also are used in the manufacture of elastomers, adhesives, sealants, coatings, and binders.  Polyether polyols are combined

12

with isocyanates such as toluene diisocyanates ("TDI") and monomeric or polymeric diphenylmethane diisocyanates ("MDI") to make polyurethanes. Defendants and their co-conspirators specified herein were the largest producers of polyether polyols during the conspiracy period.

29.     TDI is a diisocyanate used in combination with polyether polyols primarily to manufacture flexible foams. These flexible foams are used for, among other things, furniture, bedding, car seating, packing, textiles, and carpet underlay. TDI also is used in the production of coatings, adhesives, sealants, and elastomers ("CASE") applications. Defendants and their co-conspirators specified herein were the largest producers of TDI during the conspiracy period, and by 2005, Defendants and their co-conspirators specified herein owned and controlled 100% of the United States production capacity of TDI, 100% of Western European capacity, and most of European capacity. The critical inputs for the production of TDI are toluene and phosgene. All of the Defendants and their co-conspirators specified herein are vertically integrated with respect to phosgene, and Dow and Lyondell also are vertically integrated with respect to toluene.

30.     MDI is a diisocyanate used in combination with polyether polyols to, among other things, manufacture rigid foams, binders, and in some cases, flexible foam. Polymeric MDI is used primarily to make rigid and semi-rigid polyurethane foams, and pure or monomeric MDI is used primarily for injection molding. Rigid foams are used for construction, appliances, packing, insulation, and transportation. Defendants and their co-conspirators specified herein were among the largest producers of MDI during the conspiracy period, and, by 2005, Defendants and their co-conspirators specified herein owned and controlled 100% of United States production capacity of MDI, 100% of

13

Western European capacity, and almost 100% of European capacity.  The critical inputs

for the production of MDI are aniline and phosgene.  All of the Defendants and their co-

conspirators specified herein are vertically integrated with respect to phosgene, and

BASF, Bayer, and Huntsman also are vertically integrated with respect to aniline.

31.    Polyether polyols systems are formulated packages of chemicals that

include both an "A" side consisting of a diisocyanate (MDI or TDI) and a "B" side

consisting of a polyether polyol and catalysts, foaming agents, and other chemicals.  The

"A" side and the "B" side are mixed together and react to form polyurethane foams.  In

some cases (e.g., depending on geographical location or the end use of the systems), the

"A" side and "B" side labels are reversed.

32.    The structure of the markets for MDI, TDI, and polyether polyols are such

that they facilitate unlawful collusion among the Defendants and their co-conspirators and

facilitate the raising of prices above competitive levels.

33.    During the conspiracy period, MDI, TDI, and polyether polyols were each

largely commodity products with no reasonable substitutes.

34.    The Polyether Polyol Products industry is a multi-billion dollar, international

business.  During the conspiracy period, annual sales of Polyether Polyol Products

totaled more than $3 billion in the United States and totaled more than $3 billion in

Europe.

35.    Defendants and their co-conspirators specified herein were the largest

suppliers of Polyether Polyol Products in the United States and the world during the

conspiracy period.  There were a limited number of common producers during the

conspiracy period, and the markets for Polyether Polyol Products were highly

14

concentrated.  There are high barriers to entry given the capital intensive nature of the business and environmental laws and regulations.  Given Defendants' and their co-conspirators' collective high market share and control over these markets, Defendants and their co-conspirators specified herein were able to exercise market power, including controlling prices.

36.     Pricing for Polyether Polyol Products was interrelated during the conspiracy period.  On a number of occasions during the conspiracy period, price increases for Polyether Polyol Products were announced and/or became effective at or around the same time.  Some examples are included below at paragraphs 64 and 66.

37.     Defendants' and their co-conspirators' illegal conduct throughout the world, including in the United States and in Europe, directly affected the flow of interstate commerce.  In furtherance of their global conspiracy, Defendants and their co-conspirators purposefully directed their illegal conduct at the United States and Europe with the knowledge and intent that the effects of their illegal conduct would be felt in at least those places.  In particular, as a result of their unlawful combination and conspiracy to artificially fix, raise, maintain, and stabilize the price of, and allocate customers and markets for, Polyether Polyol Products, Defendants and their co-conspirators knowingly: (a) eliminated or suppressed competition in the production, distribution and/or sale of Polyether Polyol Products worldwide, including in the United States; and (b) inflated the prices that Plaintiffs and others paid for Polyether Polyol Products worldwide, including in the United States.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

## THE CONSPIRACY

38.     From at least as early as 1994 and continuing through at least December

31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-

conspirators engaged in a continuing combination, conspiracy, and agreement in

unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1.

39.     The combination and conspiracy alleged in this Complaint consisted of an

agreement, understanding, and concert of action among Defendants and their co-

conspirators, the substantial terms and/or the purpose of which was to fix, raise, stabilize,

and maintain at artificially high levels the prices of Polyether Polyol Products throughout

the world, including at least in the United States and Europe.

40.     For the purpose of forming and effectuating their combination and

conspiracy, Defendants and their co-conspirators, among other things, discussed,

formed, and implemented agreements to fix, raise, maintain, and stabilize prices, and to

allocate customers and markets, for Polyether Polyol Products.

41.               **CONFIDENTIAL INFORMATION REDACTED**

starting at least as early as 1994, the exact date(s) being unknown to

Plaintiffs, Defendants Dow and BASF and co-conspirator Bayer engaged in numerous

meetings, discussions, and/or communications regarding Polyether Polyol Products

pricing throughout the world, including at least in the United States and Europe, and

agreed to fix, raise, maintain, and stabilize the prices of Polyether Polyol Products, and to

allocate customers and markets for Polyether Polyol Products.  While the exact dates are

unknown to Plaintiffs, Lyondell and Huntsman subsequently joined the unlawful

combination and conspiracy.  Upon information and belief, Lyondell entered the Polyether

Polyol Products markets in 1998 upon its acquisition of Arco Chemical Company, and

Huntsman entered the Polyether Polyol Products markets in 1999 upon its acquisition of

ICI's polyurethanes business.

42.     In furtherance of their illegal combination and conspiracy, Defendants and

their co-conspirators conducted multilateral and bilateral meetings in various locations

throughout the world, including in the United States, Europe, and Asia, and they engaged

in numerous telephone conversations to discuss Polyether Polyol Products pricing.

Defendants and their co-conspirators also shared confidential pricing and customer

information with one another with respect to Polyether Polyol Products.  They conspired,

combined, and agreed to fix, raise, stabilize, and maintain prices for Polyether Polyol

Products throughout the world, including in the United States and Europe, agreed to

specific price increases, agreed to allocate customers and markets for Polyether Polyol

Products, and acted in concert in implementing and enforcing those illegal agreements.

On numerous occasions, Defendants and their co-conspirators discussed and

collaborated on specific price increases, whether they were planned, announced, or

already implemented.

43.     Defendants' and their co-conspirators' meetings and communications in

furtherance of their illegal combination and conspiracy continued until at least December

31, 2004, the exact dates being unknown to Plaintiffs.  Plaintiffs' prices for Polyether

Polyol Products may have continued to be inflated thereafter as a result of Defendants'

and their co-conspirators' conspiracy.

17

44.     Defendants and their co-conspirators often had communications in furtherance of their unlawful combination and conspiracy while they were at industry trade group meetings, such as those of the American Chemistry Council ("ACC"), the Alliance for Polyurethanes Industry ("API"), and the International Isocyanate Institute ("I.I.I."), among other places.

45.

**CONFIDENTIAL INFORMATION REDACTED:**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE***

***URETHANE ANTITRUST LITIGATION***

**MDL NO. 1616 (D. KAN.)**

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

**CONFIDENTIAL INFORMATION REDACTED:**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE***

***URETHANE ANTITRUST LITIGATION***

**MDL NO. 1616 (D. KAN.)**

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

**CONFIDENTIAL INFORMATION REDACTED:**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE***

***URETHANE ANTITRUST LITIGATION***

**MDL NO. 1616 (D. KAN.)**

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

**<u>CONFIDENTIAL INFORMATION REDACTED:</u>**

**<u>SUBJECT TO PROTECTIVE ORDER IN *IN RE*</u>**

**<u>*URETHANE ANTITRUST LITIGATION*</u>**

**<u>MDL NO. 1616 (D. KAN.)</u>**

o.       In addition to these meetings, Defendants and their co-conspirators had numerous other meetings and communications in the United States during the conspiracy period to discuss and agree on pricing of Polyether Polyol Products in the United States and/or worldwide, as well as meetings throughout Europe during the conspiracy period.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

46.     The meetings, discussions and communications described in paragraph 44, which occurred between and among Defendants and Bayer, and the information exchanged therein, were in furtherance of Defendants' and Bayer's unlawful combination and conspiracy to raise, fix, maintain, and stabilize the price of Polyether Polyol Products on a global basis.  In addition, the information contained in the preceding paragraph was non-public and unavailable to Plaintiffs until June of 2009.

**COUNT I**
**VIOLATION OF SECTION ONE OF THE SHERMAN ACT**

47.     Plaintiffs incorporate by reference paragraphs 1-46 above as if fully set forth herein.

48.     As a result of the foregoing, prices for Polyether Polyol Products were artificially raised, fixed, maintained, and stabilized in violation of Section 1 of the Sherman Act during the period of unlawful conduct between at least as early as 1994 and December 31, 2004, with the effects on prices possibly continuing thereafter.

49.     The purpose and effect of Defendants' and their co-conspirators' unlawful combination and conspiracy were to fix, raise, maintain, and stabilize the prices that Plaintiffs and others paid for Polyether Polyol Products in the United States and worldwide, to deprive Plaintiffs and others of the benefit of free and open competition in their purchases of Polyether Polyol Products, and to restrain, suppress, and eliminate competition in the production, distribution, and sale of Polyether Polyol Products in the United States and throughout the world between at least as early as 1994 and December 31, 2004, with the effects on prices possibly continuing thereafter.

50.     By reason of the alleged violations of the United States antitrust laws, Plaintiffs paid more for Polyether Polyol Products than they would have paid in the

22

absence of the illegal combination and conspiracy during the period between at least as early as 1994 and December 31, 2004 and possibly continuing thereafter. As a direct and proximate result, Plaintiffs have been injured in their business and property and have suffered damages in an amount presently undetermined.

## INJURY TO PLAINTIFFS

51.     Plaintiffs incorporate by reference paragraphs 1-50 above as if fully set forth herein.

52.     During the period between at least as early as 1994 and December 31, 2004 and thereafter, Plaintiffs purchased substantial amounts of Polyether Polyol Products from Defendants and/or their co-conspirators. As a result of Defendants' and their co-conspirators' *per se* unlawful combination and conspiracy, Plaintiffs were compelled to pay, and did pay, prices for Polyether Polyol Products that were substantially higher than what Plaintiffs would have paid absent Defendants' and their co-conspirators' illegal conduct. The full amount of Plaintiffs' damages will be calculated after discovery and upon proof at trial.

## INJUNCTIVE RELIEF

53.     Plaintiffs incorporate by reference paragraphs 1-52 above as if fully set forth herein.

54.     Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of antitrust violations that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

## FRAUDULENT CONCEALMENT AND TOLLING

55.     Plaintiffs incorporate by reference paragraphs 1-54 above as if fully set forth herein.

56.     At all relevant times, Defendants and their co-conspirators engaged in an illegal price-fixing conspiracy, which Defendants and their co-conspirators affirmatively and fraudulently concealed from Plaintiffs and others, and that, by its very nature, was inherently self-concealing.

57.     Plaintiffs did not discover and could not have discovered until at least November 2004, through reasonable diligence, which diligence they in fact exercised, that Defendants and their co-conspirators were engaged in a combination and conspiracy with respect to Polyether Polyol Products from January 1999 through December 2004.  In November 2004, a series of class actions were filed alleging that Defendants and their co-conspirators engaged in an unlawful price-fixing conspiracy with respect to Polyether Polyol Products sold in the United States.  Prior to the filing of these class actions, which asserted claims for the period 1999-2004, Plaintiffs did not discover and could not have discovered, through the exercise of due diligence or otherwise, that Defendants and their co-conspirators were engaged in a price-fixing conspiracy regarding Polyether Polyol Products between 1999 and 2004, because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Plaintiffs also did not discover and could not have discovered, through the exercise of reasonable diligence or otherwise, that Defendants and their co-conspirators were engaged in a price-fixing conspiracy because the conspiracy, by its very nature, was inherently self-concealing.

24

58.     Until October 2008, Plaintiffs did not discover and could not have

discovered, through the exercise of reasonable diligence or otherwise, that the price-fixing

conspiracy alleged herein was in existence prior to 1999.  Plaintiffs exercised due

diligence in investigating their potential claims relating to these products and did not

discover, and could not have discovered, the earlier unlawful conduct by Defendants and

their co-conspirators until October 2008 when other direct action plaintiffs filed complaints

alleging that the price-fixing conspiracy alleged herein was in existence prior to 1999,

extending back to at least 1994.  Plaintiffs did not have access to this information until

October 2008.  Prior to October 2008, Plaintiffs did not have any facts or evidence, nor

could they, through the exercise of reasonable diligence, have been aware of any facts or

evidence, that Defendants' and their co-conspirators' unlawful conduct began prior to

1999, because Defendants and their co-conspirators used and continue to use deceptive

and secret methods to avoid detection and to affirmatively conceal the existence of their

illegal conduct.  In addition, prior to October 2008, Plaintiffs did not discover, and could

not have discovered, through the exercise of reasonable diligence or otherwise, that the

conspiracy was in existence prior to 1999 because the conspiracy, by its nature, was

inherently self-concealing.

59.     Plaintiffs did not discover, and could not have discovered, through the

exercise of reasonable diligence or otherwise, Defendants' and their co-conspirators'

unlawful conduct prior to the time periods set forth above because Defendants and their

co-conspirators conducted their conspiracy secretly, deliberately and affirmatively

concealed the true nature of their unlawful conduct and acts in furtherance thereof, and

25

fraudulently concealed their activities through various means, methods, and affirmative

acts designed to avoid detection by Plaintiffs and others.

60.     Throughout the relevant time periods (*i.e.*, until November 2004 for January

1999 to December 2004 claims and until October 2008 for claims prior to 1999),

Defendants and their co-conspirators successfully concealed from Plaintiffs the existence

of their illegal combination and conspiracy alleged herein through affirmative acts of

fraudulent concealment including, but not limited to:

a.     Meeting and communicating secretly with one another, including by
telephone, to discuss prices, customers, and markets for Polyether Polyol Products sold
in the United States and Europe, and to effectuate the collusive increases described
herein.  Defendants and their co-conspirators affirmatively concealed their meetings and
communications.

**CONFIDENTIAL INFORMATION REDACTED:  SUBJECT
TO PROTECTIVE ORDER IN *IN RE URETHANE
ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

In addition to being affirmatively concealed, all of
Defendants' and their co-conspirators' secret, conspiratorial communications were, by
their very nature, self-concealing in nature and not discoverable by Plaintiffs in the
exercise of reasonable diligence.

b.     Meeting secretly outside of the United States on a number of
occasions in an effort to avoid detection and liability in the United States, to discuss
prices, customers, and markets for Polyether Polyol Products sold in the United States
and Europe, and to effectuate the collusive increases described herein.  Defendants and
their co-conspirators affirmatively concealed these meetings and communications.

**CONFIDENTIAL INFORMATION REDACTED**

In addition, these secret
conspiratorial meetings and communications were, by their very nature, self-concealing in
nature and not discoverable by Plaintiffs in the exercise of reasonable diligence.

c.     Agreeing among themselves at meetings and in communications not to disclose or discuss publicly or privately beyond those involved, the true nature and substance of the acts and communications in furtherance of the alleged combination and conspiracy.  Defendants and their co-conspirators knew that their conduct was illegal, and specifically agreed that they should not disclose their meetings or communications.

## CONFIDENTIAL INFORMATION REDACTED

d.     Giving deliberately false and pretextual reasons for the price increases of Polyether Polyol Products sold by Defendants and their co-conspirators during the conspiracy period, and falsely attributing such pricing as being the result of competitive factors and natural market forces rather than unlawful conspiratorial conduct. Defendants and their co-conspirators' explanations were false and misleading and were intended to and did conceal their illegal combination and conspiracy.  Examples of these false and pretextual statements are set forth at paragraphs 64 and 66 below.

e.     Denying the existence of the conspiracy in connection with the Polyether Class Action.

61.     It was not uncommon in the Polyether Polyol Products industry for the producers to periodically announce price increases for Polyether Polyol Products.  In dealing with Defendants and their co-conspirators, Plaintiffs were accustomed to price increases from time to time as a part of what Plaintiffs believed was a competitive industry and normal, legitimate business practices.

62.     During the conspiracy period, Defendants and their co-conspirators issued price increase announcements and made numerous statements about price increases in industry publications reviewed by Plaintiffs, issued price increase letters that were distributed to and relied on by Plaintiffs, and made statements directly to Plaintiffs.  These price increase announcements, statements, and letters contained deliberately false and pretextual explanations for price increases of Polyether Polyol Products.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

63.    Defendants and their co-conspirators consistently attributed their price increases of Polyether Polyol Products – both before and after they were announced – to normal, competitive market forces, including, but not limited to, raw material cost increases, low margins, desire to increase return on investment, and supply and demand factors.  These price increases, however, were the product of the agreement by Defendants and their co-conspirators and were the direct result of their unlawful combination and conspiracy alleged herein.  Defendants' and their co-conspirators' false and pretextual explanations for the price increases were designed to conceal the true reasons for the price increases and to mislead Plaintiffs into believing that normal market forces justified the price increases.  Plaintiffs reasonably believed Defendants' and their co-conspirators' stated reasons for the increases.  Plaintiffs did not know and could not have known until November 2004 for 1999-2004 claims and until October 2008 for pre-1999 claims that the justifications provided by Defendants and their co-conspirators were false and designed to conceal Defendants' and their co-conspirators' unlawful combination and conspiracy.

64.    Some examples of Defendants' and their co-conspirators' many false and pretextual price increase announcements and/or statements in industry publications include the following:

a.    In an August 8, 1994 article, Chemical Marketing Reporter reported that MDI prices in the United States had gone up in July of 1994 and quoted defendant Dow as stating that "'[t]he two leading factors in the increase were the high operating rates and the fact that the industry had gone 12 months without a raise.'"

b.    In a September 28, 1994 article, Chemical Week reported that Miles, Bayer's then U.S. subsidiary which became Bayer Corporation, had advised that U.S. prices for isocyanates might be increased industry-wide in the first half of 1995, due to pent-up demand.

28

c.      In a September 11, 1996 article, Chemical Week reported that Dow had stated that it was increasing prices of TDI, effective October 1, 1996, blaming the rising costs of feedstocks.

d.      In its June/July 1998 publication, Urethanes Technology reported that Bayer attributed rising prices of MDI to growing demand and tight supplies. Environmental and transport costs were also cited as reasons for an MDI increase.

e.      In a June 8, 1998 article, Chemical Market Reporter also reported that Bayer attributed its MDI increase to higher demand and rising environmental and transport costs.

f.      In its July 1998 publication, Plastics Technology reported that Bayer, Dow and BASF were raising MDI, TDI, and polyether polyols prices and indicated that the moves were attributed to tight supplies and growing demand.

g.      In its April/May 2000 publication, Urethanes Technology reported that Dow attributed industry-wide price increases on TDI and MDI to increased feedstock prices, leading to pressure on margins.

h.      In its June/July 2000 publication, Urethanes Technology reported Lyondell's statements that industry-wide price increases on polyols were needed to support reinvestment in capacity. The increased cost of feedstock propylene also was cited as a reason for polyol price increases.

i.      In a December 2000/January 2001 Urethanes Technology article, BASF AG and its subsidiary, Elastogran GmbH, made public statements indicating that they expected prices of polyols, TDI, and MDI to rise globally because of "increasing demand" and the "tight supply situation."  BASF also blamed high prices on "higher crude oil prices" and noted the need for "price development" to justify investment in new plants. BASF went on to state that it had had "rounds of discussions with customers" on this.  In the same edition of Urethanes Technology, Lyondell defended a recent United States price increase by Lyondell and other suppliers as an indication of "how tight the market is."

j.      In a May 2002 publication, Chemical Market Reporter quoted Lyondell as stating that "production costs" in addition to "the uptick in demand" were strong reasons for the United States price increase on TDI.  Dow was quoted as attributing its global price increase on polyols to the need to "partially recover eroded margins." Huntsman noted "unacceptable margins" that "will not support expansions necessary for keeping pace with demand" in connection with United States price increases on TDI and MDI.

k.      In an October 2002 publication, Urethanes Technology reported that Dow increased European prices for TDI and polyols in September 2002 and MDI and polyols in October 2002.  Dow blamed the price increases on margins that "do not warrant

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

necessary future investments in technology and capacity that would allow us to keep up with market growth."

l.       In its February/March 2003 publication, Urethanes Technology reported that Lyondell said that "it achieved price increases and improved margins on TDI due to a tight supply situation in the market throughout 2002." In the same publication, Dow indicated that margins on TDI, MDI, and polyols were "still below satisfactory levels," and that, for all regions, "the need for margin restoration is critical. . .Dow must take immediate action to improve pricing to reasonable levels. . . . Our price increases are ongoing. . . . There will be future announcements as well and they will be implemented as quickly as possible for all products and for all regions."

m.      In a March 2003 publication, Rubber & Plastic News reported that Dow, BASF, and Huntsman intended to increase United States prices for MDI, TDI and polyols in April 2003. BASF attributed the increase to "falling margins caused by significant and ongoing increases in raw material, energy and transportation costs." Huntsman blamed the price increase on "record highs" for raw materials, strong demand, and the need to invest in manufacturing capability. Dow cited "high and volatile oil and energy pricing . . . creating escalated raw material and distribution costs and a subsequent decrease in margins."

n.       In a June 2003 article, Chemical Market Reporter quoted Huntsman as stating that its global price increases had "partly offset higher energy costs, but they have not been sufficient to return acceptable margins or protect the industry from future energy hikes." In the same article, Dow, having raised prices in the United States, stated that "[g]enerally, the overall global TDI increase is being driven by margin recovery initiatives and high energy and feedstock costs."

o.       In an April 2004 article, Chemical Market Reporter quoted Huntsman as stating that favorable market conditions have resulted in some price increases on MDI, but that "any margin improvements have largely been eroded by high feedstock costs" and that Huntsman's goal, therefore, "is to see prices rise to a level at which reinvestment can be sustained." Bayer stated that its recent price increase on MDI was successfully implemented, but that the "overall performance of the TDI/MDI business continues to labor under the heavy weight of high energy and raw material costs." Dow cited "margin compression" and the high cost of raw materials and energy in connection with its United States price increases on MDI, TDI, and polyols. BASF blamed current market conditions and "low investment levels" for its isocyanates increases.

65.     Industry publications such as Chemical Market Reporter, Urethanes

Technology, Chemical Week, and others in which Defendants and their co-conspirators

made representations about the reasons for price increases were widely published and

reviewed by purchasers of Polyether Polyol Products, including Plaintiffs in this action.

30

Defendants' and their co-conspirators' representations were false and pretextual and

were designed to affirmatively conceal that these price increases were instead the result

of Defendants' and their co-conspirators' unlawful combination and conspiracy.  These

false explanations successfully misled Plaintiffs into believing that these increases were

the result of competitive market forces rather than unlawful collusion.  Plaintiffs could not

have discovered Defendants' and their co-conspirators' conduct because they did not

have access to contemporaneous information sufficient to allow Plaintiffs to determine

that Defendants' and their co-conspirators' justifications were false and pretextual.

66.    In addition to providing false information to be published in industry trade

publications, Defendants and their co-conspirators provided false and pretextual reasons

for their price increases in numerous letters to or in meetings with Plaintiffs announcing

these increases at or around the same time.  A few examples include the following:

a.    Dow and Bayer announced a polyol price increase of $.03/lb, effective January 1 and 3, 2000, respectively.  Dow's letter was dated December 3, 1999 and Bayer's letter was dated December 15, 1999.  Dow attributed the price increase to "an increase in energy and raw material costs" and "supply chain problems."  Bayer stated that "[e]scalating raw materials and energy costs, coupled with increased costs necessitated this price increase."

b.    Lyondell and Dow announced price increases on TDI of $.10/lb, effective March 15 and April 1, 2000, respectively.  Lyondell's letter was dated February 14, 2000, and Dow's letter was dated February 25, 2000.  Lyondell's letter blamed the price increase on "significant and sustained increase in raw material costs" and the extremely tight supply situation.  Dow's letter referenced "limited production capacities and inventory."

c.    Dow and Bayer announced both polyol and TDI price increases of $.07/lb and MDI price increases of $.08/lb, effective July 1, 2000.  Dow's letter regarding polyols was dated May 15, 2000, and its letters regarding TDI and MDI were dated May 30, 2000.  Bayer's letters were dated May 31, 2000.  Dow blamed the polyol price increase on the rising cost of raw materials and "increased cost pressures" and blamed the MDI increase on "continued cost pressure."  Bayer stated the polyol and MDI increases were "based on significant increases in raw material and energy costs, as well

31

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

as continuing rapid growth in demand," and attributed the TDI increase to raw material increases.

      d.     Dow and Bayer both announced an MDI price increase of $.06/lb, effective April 1, 2002 for Dow and effective April 15, 2002 for Bayer. Dow's letter was dated March 14, 2002, and Bayer's letter was dated April 1, 2002. Dow cited "erosion of margins" and "loss of profitability." Bayer similarly asserted that the increase was necessary "to regain acceptable margins to maintain investments."

      e.     Dow and Bayer both announced a $.06/lb price increase for MDI and polyols, effective January 1, 2003. Dow's letters were dated November 22, 2002, and Bayer's letter was dated November 27, 2002. Dow blamed the need to raise MDI prices on "continued cost pressure on MDI production" that has resulted in "the erosion of margins and the loss of profitability." Bayer's letter stated that raw material increases and continued cost pressures have resulted in "further deterioration of profitability for these lines."

      f.     Dow announced polyether polyols and MDI price increases of $.06/lb, effective October 1, 2003. Bayer announced a $.06/lb price increase on polyether products and MDI, effective October 1, 2003. Dow's letters were dated August 25, 2003, and Bayer's letter was dated September 4, 2003. Bayer claimed the increase was "necessary to offset the continued pressure of raw material and energy increases."

      g.     BASF and Dow both announced a $.06/lb price increase for polyols, effective April 1, 2004. BASF's letter was dated February 19, 2004. Dow's letter was dated February 16, 2004. BASF's letter cited "a period of low investments in capacity and persistently high benzene, natural gas, propylene and chlorine feedstock cost" as driving the polyols price increase. Dow's letter cited "considerable increases on energy and raw material costs in 2003 and in the first quarter of 2004."

      h.     BASF and Dow issued a $.005/lb surcharge on polymeric MDI, effective August 3, 2004 and August 9, 2004, respectively, based on the rising cost of benzene. In an August 3, 2004 meeting, BASF blamed the surcharge on the fact that it was running at 100% capacity and demand. Dow's letter was dated August 5, 2004, in which Dow explained that the "surcharge [was] the result [of] the unprecedented high cost of benzene, which has risen sharply this year, and is at an all time high."

      i.     BASF and DOW both announced price increases of $.10/lb for MDI, effective December 1, 2004. BASF's and Dow's letters were dated October 29, 2004. BASF's letter noted the substantial increase in demand for MDI and the tight industry production capacity and stated that BASF had "no other options but to raise prices to recover margins." Dow cited to continued strong demand for MDI products that has resulted in a global shortage of MDI products.

      67.     The reasons and justifications that Defendants and their co-conspirators

provided for price increases of Polyether Polyol Products in their letters to Plaintiffs during

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

the conspiracy period were false and pretextual and were designed by Defendants and their co-conspirators to affirmatively conceal that these price increases were instead the result of Defendants' and their co-conspirators' unlawful combination and conspiracy. These false explanations successfully misled Plaintiffs into believing that these increases were the result of competitive market forces rather than unlawful collusion.  Plaintiffs could not have discovered Defendants' and their co-conspirators' conduct because Plaintiffs did not have access to contemporaneous information sufficient to allow Plaintiffs to determine that Defendants' and their co-conspirators' justifications were false and pretextual.

68.     The District Court of Kansas in the Polyether Class Action has already found that Defendants' false and pretextual reasons, such as those alleged above, in paragraphs 55 through 67, constitute sufficient pleading of fraudulent concealment.

69.     Because Defendants and their co-conspirators affirmatively, actively, and fraudulently concealed the combination and conspiracy alleged herein, and because the conspiracy was self-concealing, Plaintiffs were unaware of the fact that prices for Polyether Polyol Products had been secretly agreed upon and fixed by Defendants and their co-conspirators.  Plaintiffs could not, through the exercise of reasonable diligence, which they in fact exercised, have discovered until November 2004 that a conspiracy existed from 1999 through 2004 and could not have discovered until October 2008 that a conspiracy existed prior to 1999.

70.     The filing of class plaintiffs' initial class action on November 23, 2004, and subsequently-filed related class actions, tolled the statute of limitations for all class members, including Plaintiffs.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court to:

a.      Enter judgment for Plaintiffs declaring that the foregoing combination and conspiracy, and the acts done in furtherance thereof, were an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

b.      Enter judgment in favor of Plaintiffs for the damages period and jointly and severally against Defendants for treble the amount of the jury verdict and for attorney's fees, costs and prejudgment interest as provided for in Section 4 of the Clayton Act;

c.      Enjoin Defendants from continuing the unlawful conspiracy alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes or effects; and

d.      Enter, and retain jurisdiction to enter, such further orders and decrees as may be necessary or appropriate to remedy the injury to Plaintiffs or as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

NPCOL1:1607275.1-SC-(DCE) 044139-00001
DSMDB-2682981v01

Dated:  November 3, 2009

NEXSEN PRUET, LLC

David C. Eddy
Marguerite S. Willis
Travis C. Wheeler
1230 Main Street, Suite 700
Columbia, SC  29201
(803) 771-8900
*(pro hac vice admission pending)*

ADAMS HOLCOMB LLP

R. Bruce Holcomb
Christopher Leonardo
1875 Eye Street NW, Suite 810
Washington, DC  20006
(202) 580-8820
*(pro hac vice admission pending)*

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

/s/ Mauro M. Wolfe
Mauro M. Wolfe (MW-2380)
1633 Broadway
New York, New York  10019-6708
(212) 277-6726

Richard J. Leveridge
Elaine Metlin
Jodi Trulove
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200
*(pro hac vice admission pending)*

Attorneys for Plaintiffs Dash Multi-Corp, Inc., MarChem Corporation, MarChem Southeast, Inc., and MarChem Pacific, Inc.

35